ANTHONY REID,           )
                                )
       *Petitioner,*       )
v.                       )       No. 1:05-CV-55
                                )       *Chief Judge Curtis L. Collier*
HOWARD CARLTON, Warden,   )
                                )
       *Respondent.*      )

## **M E M O R A N D U M**

Anthony Reid ("Reid" or "petitioner") has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Court File No.2). In 2000 Reid was convicted by a jury of one count of first degree felony-murder, one count of especially aggravated robbery, one count of aggravated robbery, and one count of evading arrest. Petitioner received an effective prison sentence of life plus twenty-five years. He now petitions this Court for review of those convictions. He bases his effort for relief on claims of denial of his constitutional right to effective assistance of counsel, denial of due process, and insufficient evidence (Court File Nos. 2 & 3).

Howard Carlton, ("respondent") Warden of the facility where petitioner is housed, filed a response to petitioner's petition for writ of habeas corpus (Court File No. 7). Respondent has filed a document entitled Answer to Petition for Writ of Habeas Corpus (Court File No. 7). The Answer contains most of the elements required by Rule 5 of the Habeas Corpus Rules: it states whether the Petitioner has exhausted state remedies; identifies what transcripts or other records of state proceedings are in existence; and supplies the transcripts and other portions of the record, including the petitioner's briefs on appeal and state court opinions. But the Answer goes further.

A large component of the Answer was seemingly designed to function as a motion for

summary judgment or motion to dismiss. The Answer was filed by the respondent's attorney, a Tennessee assistant attorney general, by means of the Court's electronic case filing system. It was designated by the filer as an "Answer/Response" on the Court's electronic case filing system docket sheet. Motions for summary judgment and motions to dismiss have been filed in other § 2254 cases by the Attorney General after the respondent was ordered to "file an answer or other pleading." Those earlier motions for summary judgment and motions to dismiss, however, were not incorporated in the answer. The Court does not approve of a practice whereby a motion for summary judgment or a motion to dismiss is engrafted onto an answer or other pleading. Nevertheless, the Court will treat respondent's "Answer/Response" as a motion to dismiss and for summary judgment.[1]

After considering the filings of respondent and petitioner, the record of the state proceedings, and the applicable law, the Court will **GRANT** respondent's motion to dismiss and for summary judgment (Court File No. 7) and **DENY** petitioner's § 2254 petition and amended petition (Court File Nos. 2 & 3).

I.      STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the RULES GOVERNING SECTION 2254

---

[1]      In the document, respondent argues the petition must be dismissed as to the procedurally defaulted claims and summary judgment is appropriate on the two remaining claims because the state court conclusion does not violate the standard set forth in *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (Court File No. 7).

PROCEEDINGS IN THE UNITED STATES DISTRICTS COURTS, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge may dispose of the case as justice dictates. After carefully reviewing the required materials, the Court finds it unnecessary to hold an evidentiary hearing

Federal courts review decisions of the state courts pursuant to 28 U.S.C. § 2254(d) which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This statute generally limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

A state court's determination of a factual issue shall be presumed to be correct and the presumption of correctness can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254 (e)(1). Credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy,* 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied,* 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated*, 545 U.S. 1151 (2005); *Smith v. Jago,* 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied,* 495 U.S. 961 (1990).

## II.    PROCEDURAL HISTORY

On March 8, 2000, petitioner was convicted by a jury of one count of first degree felony-murder, one count of especially aggravated robbery, one count of aggravated robbery, and one count of evading arrest. Petitioner was sentenced by the trial court to life imprisonment for first-degree murder. Such sentence was ordered to run consecutively to all other counts. The court imposed concurrent sentences for the convictions: twenty-five years for especially aggravated robbery, ten years for aggravated robbery, six years for attempted aggravated robbery conviction, and two years for evading arrest.

Petitioner's convictions and sentences were affirmed on direct appeal. *State v. Reid*, 2001 WL 818205 (Tenn. Crim. App. 2001). Petitioner was denied permission to appeal by the Tennessee Supreme Court on December 27, 2001.

Petitioner filed a *pro se* petition for state post-conviction relief on June 19, 2002. An amended petition was filed on February 19, 2003, and a second amended petition was filed on March 5, 2003. The post-conviction court denied relief and the Court of Criminal Appeals affirmed the denial of post-conviction relief. Permission to appeal was denied by the Tennessee Supreme Court on September 13, 2004. *Reid v. State*, 2004 WL 626714 (Tenn.Crim.App. 2004).

## III.    FACTUAL BACKGROUND

The facts of the crime will be taken from the appellate court's opinion on direct review. The facts presented in the state post conviction hearing will be taken from the appellate court's opinion affirming the denial of petitioner's state post-conviction petition.

A.    **Facts from Criminal Trial**

The facts as to the convictions which are before this Court are taken from the appellate

court's opinion affirming petitioner's convictions and sentences:

On May 22, 1998, Lebron Hensley, a patrolman for the Cleveland Police
Department, received a report that a shooting had occurred at the apartment complex
located at 580 Dooley Street in the city of Cleveland.  The first officer to arrive at the
scene, Hensley[,] observed two gunshot victims on a balcony of one of the
apartments.  One victim was sitting in a chair and bleeding from the head.  The other
was lying on the floor face down in a pool of blood.  Hensley immediately checked
their condition.  The victim in the chair was conscious but unresponsive-he was
leaning over with his face in his hands and appeared to have been shot somewhere
in the head.  The victim on the ground exhibited no vital signs at all.  Within a matter
of minutes, the ambulance and additional officers arrived at the scene.  The victims
on the balcony were later identified as Kenneth Blair and Charles Massengill.  Blair
was the victim on the ground, and Massengill was seated in the chair.  Hensley did
not see any other victims at the time.

Barry Snyder, a paramedic working for Bradley County EMS, was a member of the
emergency medical team called to the crime scene.  When Snyder arrived, he found
Massengill sitting in a chair with his head in his hands and what appeared to be a
gunshot wound to his right eye.  Another gunshot victim, Blair, was lying on the
floor.  Blair had been shot in the head and was in worse shape than Massengill.  The
medical team placed Massengill and Blair on backboards and then into the
ambulance.  By that time, Blair was in cardiac arrest.  They performed CPR, but
Blair died after arriving at Erlanger Hospital.  Later that same day, the EMS team
was called back to 580 Dooley Street to transport a third victim of the incident,
Marcus Williams, to Bradley Memorial Hospital.  Williams had complained earlier
of a pain in his lower back and, upon closer inspection, it turned out that he had a
bullet lodged in it.

Sergeant Randy Gates, an officer with the Cleveland Police Department, testified that
he was the second or third officer to arrive at the scene.  When he reached the
upstairs balcony area, he observed Blair lying on the floor in "bad shape" and the
other victim, Massengill, slumped over the railing with an eye wound.  Because the
balcony was congested with medical personnel, Gates decided to assist with securing
the area downstairs.  On his way he encountered two more victims: Eric Benion and
Marcus Williams.  Benion had been shot in the hand and Williams had gunshot
wounds in his leg and back.

Once the victims were removed for medical treatment, Gates and the other police

officers began interviewing witnesses and searching the area for evidence. The police located a set of keys belonging to one of the victims, several spent rounds of ammunition (later identified as .22 caliber shell casings), a baseball cap, and a bottle of some kind of alcoholic beverage in the gravel parking lot below the stairs. County officials reported spotting persons and a car matching the witnesses' description of the suspects and their vehicle: three black males in a small, white four-door car, with a 'drive-out tag' in the rear window.

Jimmy Woody, a patrolman for the Bradley County Sheriff's Office, testified that he was one of the police officers involved in the pursuit of the shooting suspects. The chase began shortly after Officer Paul Leroy initially spotted the suspects' vehicle near the Waffle House on Georgetown Road. Leroy reported observing the vehicle drive onto Interstate 75, near exit 25, and he followed it for several miles while waiting for assistance. When the suspects reached exit 33, Woody was within a mile of Leroy and both officers activated their blue lights and sirens. The suspects responded by accelerating. They drove recklessly, at speeds of 70 to 80 miles per hour, constantly switching lanes and also traveling in the emergency lane. The chase continued for approximately two miles. Then the driver of the vehicle suddenly pulled over and stopped the car in the median on the left side of the interstate, between the Charleston exit and the river on the northbound side. The passenger in the front seat remained in the vehicle, but the driver and backseat passenger leaped out of the car and ran west toward the southbound lane. Sergeant Collins and Clancy Bryson, also involved in the pursuit, chased the fleeing suspects on foot. One was captured in the woods, and the other was apprehended sometime later near the truck stop at exit 33. Woody identified Defendant as the driver of the vehicle, but did not testify as to whether Defendant was the suspect captured in the woods or the one apprehended later, near the truckstop.

Sergeant John Collins, a patrolman for the Bradley County Sheriff's Office, testified that he also participated in the pursuit of Defendant. As the officers were closing in on the vehicle, Collins made eye contact with the driver, who grinned at him as he pulled alongside the suspects. Collins identified Defendant as the smiling driver and corroborated the testimony given by Officer Woody regarding the pursuit. Collins also confirmed that both he and Officer Bryson chased the two suspects who fled on foot. Apprehending the first suspect rather quickly, the officers then searched the woods with police dogs for the second but were initially unsuccessful. Upon returning to their units, a dispatcher informed them that someone from the truck stop at exit 33 reported a person matching the description of the missing suspect standing on the interstate trying to flag a ride. Detective Quinn drove to the exit and picked him up. During his testimony, Collins was not asked whether Defendant was the first suspect, apprehended in the woods, or the one discovered later at the truckstop.

Steve Bennett, a detective with the Cleveland Police Department, testified that he assisted with the search of the crime scene and the defendants' car after they were

apprehended. At the scene of the shooting, the police found five .22 shell casings. Inside the car, the police discovered two boxes of .22 rimfire ammunition, a black stocking-type mask, a cap, and articles of clothing. Two days later, on Interstate 75, northbound, the police also discovered the three guns involved in the crime: a .22 caliber revolver pistol, a Phoenix .22 caliber semi-automatic pistol, and a Haskell .45 caliber semi-automatic pistol. Two of the weapons were wrapped in a black shirt, and the third was laying close by. The particular type of .22 revolver discovered on the interstate can hold six rounds in its chamber, and it contained five rounds when the police found it. The Phoenix .22 semi-automatic is capable of holding eight rounds, fully loaded, and it had five rounds remaining in the clip. (Bennett was not questioned about the status of the .45 weapon upon discovery.) The Tennessee Bureau of Investigation crime lab matched the five casings recovered from the crime scene to the Phoenix .22 semi-automatic handgun.

Detective Bennett testified that he first encountered Defendant and the codefendants, O'Neil Sanford (Defendant's half-brother) and Orlando Malone, at the Bradley County Sheriff's Department an hour or two after the shooting occurred. Upon searching the suspects, the police discovered approximately $40.00 in cash on Sanford and 79 cents or so in change on Malone. Defendant had no cash on his person. When Bennett was asked by the prosecutor whether he attempted to get a statement from Defendant and whether he cooperated, Bennett replied "Yes" and "No," respectively. Defense counsel objected. A bench conference was then held out of the presence of the jury. When the jury returned, the trial judge instructed them, *inter alia,* to ignore Bennett's response to the prosecutor's question concerning whether or not Defendant gave the police a statement.

During cross-examination, Bennett was asked whether he performed a gunshot residue test on Defendant and he responded affirmatively. He testified that propellant powder residue is normally present on the hands of a person who fires a weapon and that the residue test performed on Defendant gave inconclusive results. On redirect-examination, Bennett revealed that all three defendants were tested for powder residue and that the test results were all similarly "inconclusive." By way of explanation, Bennett read to the court the following excerpt from the TBI report concerning their test results: "some .22 rimfire ammunition does not have all the elements needed for gunshot residue analysis. These results cannot eliminate the possibility that the individual could have fired or handled a gun." Bennett testified that .22 ammunition does not contain the primer which is necessary for conclusive results in this type of test.

Eric Benion, one of the victims, testified that he was with Kenneth Blair, Marcus Williams, and Charles Massengill, at 580 Dooley Street on May 22, 1998, when the shooting incident occurred. Benion and Williams had started the evening at Benion's house. When Benion's girlfriend became argumentative, Williams and Benion left to go to Williams' apartment. As they were leaving, Massengill

also showed up and they invited him along. Blair arrived at Williams' apartment later on. The men spent the majority of the evening sitting on the balcony talking and joking and drinking a few beers. They noticed three black women with three black men in the parking lot downstairs. One of the men (the codefendant, Malone) approached them, asking whether anyone had change for a fifty-dollar bill. They replied that they did not. Malone then asked whether they had an extra beer, but they did not have a spare beer either. Thereafter, Malone rejoined his friends, Sanford and Defendant, in the parking lot. It appeared to Benion as though they were leaving, but soon afterward they returned and ran up the stairs to where Benion and his friends were sitting on the balcony. Benion identified Defendant as one of the persons who ran up the stairs.

All three men-Defendant, Sanford, and Malone-had guns, and they ordered Benion and the others onto the floor. Benion did not obey right away, but ran back into the apartment. Malone found him and ordered him back outside with the others. Massengill was in a chair; the others were laying on the ground. With his gun pointed at Benion and Williams, Malone proceeded to look through their pockets for money. He took $28.00 from Benion. No one resisted or argued with the armed men during the robbery, but then Benion heard Blair mumble something unintelligible. In response, Benion heard one of the gunmen respond, "What? What?" and the shooting started. At this point, Benion jumped up, ran back into the apartment and leaped through the second story window. When he landed, he ran to another apartment building and asked a friend to call the police. He had been shot in the hand during his escape. Benion gave the police a description of the shooters' car and a statement, and then identified Defendant from a lineup at the police department later that evening.

Marcus Williams testified that he resided in the apartment which became the scene of the shooting incident. Prior to the shooting, Williams and Benion were pitching horseshoes at Benion's house. When Benion and his girlfriend began to argue, they decided to go to Williams' apartment. Massengill arrived as they were leaving, so they invited him to come along. About an hour later, Blair joined them and they all had a few beers together. By this time, Sanford, Malone and Defendant were observed talking to some girls in the parking lot. Williams recognized the girls from the neighborhood, but had never seen the men before. Two of the girls came upstairs to where Williams and his friends were sitting on the balcony and asked whether anyone had a quarter. The three men followed them. Malone asked for a beer and whether anyone had change for a fifty-dollar bill. Williams told him that they had neither.

Williams testified that, after he refused Malone's requests, everything happened very quickly. The three men ordered Williams and his friends

down onto the floor. All three carried guns. Williams saw what appeared to be two .22 caliber weapons and a .45 caliber handgun. Benion jumped up and ran into the house, but they made him come back outside. Then Defendant and Sanford searched the victims' pockets for money. Having taken their money, the gunmen were preparing to leave when Blair mumbled something that Williams could not understand. In response, one of them turned around and said "What?" Then the shooting started. Williams and Benion immediately jumped up and ran into the apartment. Benion leaped out the window and notified the police. Williams locked the door behind him, and stayed in the apartment until the ambulance arrived. He heard three more gunshots before the men left. When he emerged, he observed Massengill leaning over the rail and bleeding. Blair appeared dead. Benion had been shot in the hand as he escaped. Massengill had gunshot wounds in the knee and lower back

Williams further testified that none of the victims resisted the gunmen, and he identified Defendant as one of the three men who took part in the robbery. On cross-examination, Williams admitted that his blood alcohol level was 0.13 when the hospital tested him and that he drank three beers during the evening of the incident.

Charles Massengill, also a victim of the shooting, testified that he went to Williams' apartment after work at approximately 11:00 p.m. He was drinking beer with Benion, Williams, and Blair. They were not bothering anyone. The first person to approach them was Malone who wanted change for a fifty-dollar bill. When they told him that they did not have change, Malone went back downstairs but came back fifteen or twenty minutes later with Sanford and Defendant. Massengill observed that Defendant and Sanford had guns. Sanford made Massengill sit in a chair and pointed a gun at his right eye. Malone ordered Benion, Williams, and Blair outside onto the balcony and made them lie down face first. Defendant pointed his gun at Blair while the three men searched the victims' pockets for money. They took 79 cents from Massengill, and then Blair mumbled something. Defendant responded with the words, "You say what?" and then shot Blair. Immediately afterward, Sanford shot Massengill in the right eye and he lost consciousness. He awoke later, in the hospital, with an eye injury and fractured neck. His blood alcohol was reported as 0.10.

The transcript of the stipulated testimony of Dr. Charles Harlan, a licensed pathologist who performed the autopsy on Kenneth Blair, was read into evidence by the attorneys during trial. Dr. Harlan's testimony revealed the cause of Blair's death was a gunshot wound to the right side of the head. Dr. Harlan was able to recover a small bullet from Blair's brain which was consistent with the size of bullet typically fired from a .22 caliber weapon.

9

Dr. Harlan also performed a blood and urine analysis on the deceased which showed positive results for ethyl alcohol, "THC" or tetrahydrocannabinol (the active ingredient in marijuana), and benzoylecgonine (a metabolic by-product of cocaine). Specifically, the results indicated that the victim consumed the equivalent of one beer and a small quantity of cocaine prior to his death. By contrast, the quantity of THC in the victim's blood was fairly large.

Anthony Reid, the defendant, testified that he lived in Chattanooga, Tennessee, and admitted that he had previously been convicted for possession of cocaine with intent to sell. On the day of the shooting, Defendant had been out of jail for approximately five months. He and his half-brother, O'Neal Sanford, and a man named Orlando Malone had decided to come to Cleveland to visit a friend and sell drugs, specifically, crack cocaine. Defendant had approximately $250.00 worth of crack cocaine in his possession when they arrived in town. Shortly thereafter, they met some local girls who "wanted to drink or kick it" with them. Defendant testified that he and Malone were mainly interested in "getting drunk" and "having sex" at that point. The women asked Defendant and his companions to follow them to a grocery store near the apartment building at 580 Dooley Street, where the men proceeded to spend two and one-half hours talking with the women in the parking lot and selling drugs to passersby. Defendant noticed the crowd of people standing on the balcony of Williams' apartment, but they did not engage in any conversation.

After Defendant and his companions returned from renting a motel room at the request of the women, Malone went up the stairs near Williams' balcony "to get the females" who were waiting in an apartment nearby. On his return, he stopped to talk to Williams and his friends about something. Defendant testified that he did not know what the conversation was about and that no one appeared angry afterward. Defendant admitted that, at this point, he and his friends were intoxicated. Malone wanted the women to come to their motel room, but they told him they needed to make a phone call first. While the men waited for the women to return, Malone went back to ask the people at the Williams' apartment for a beer. When he came downstairs empty-handed, Sanford went back up the stairs with him. It started raining, so Defendant went upstairs also. When he reached the top stair, he heard arguing. Then "someone got pushed and a gunshot went off," so Defendant ran back downstairs to the car to "get out of the way."

Defendant testified that he had some difficulty getting the car to start. By the time he did, Sanford and Malone had jumped in the car with him and they all drove away. Defendant was frightened because he was on probation and was supposed to stay out of trouble. When the police spotted them and tried to

pull them over, Defendant "mashed" the accelerator in an attempt to escape. Sanford ducked down, and Malone wrapped the guns inside of his shirt. Malone instructed Defendant to pull over to the side of the highway so he could throw the guns out of the car, and Defendant complied. When Defendant finally stopped the car, he tried to get away on foot, but the police caught him and arrested him.

Defendant further testified that, to the best of his knowledge, Malone and Sanford did not rob anyone of anything on May 22, 1998, and, furthermore, Defendant did not know that Malone and Sanford had guns with them that day. Defendant also testified that he did not have a gun, he did not shoot anyone, and he did not rob anybody that evening. Defendant claimed his only interests centered on drugs and females.

On cross-examination, Defendant explained that, even though he had not done anything wrong, he ran from the police because he feared for his life. The Chattanooga police had recently killed one of his friends, and Defendant believed that the police might kill him too. With regard to the victims' testimony that Defendant carried a gun, he claimed that all three witnesses were either lying or must have confused him with someone else. Defendant claimed that he was far too busy running away to recall anything about the shooting incident, except for hearing gunshots.

*State v. Reid*, 2001 WL 818205, *2 -7 (Tenn.Crim.App.,2001).

### B.    Facts from Post-Conviction Hearing

The facts from the state post-conviction evidentiary hearing are taken from the decision of

the appellate court:

The Petitioner testified that, after his conviction but before his appeal, Counsel spoke with him only one time.  The Petitioner explained that he raised "about 10 issues" that he really wanted Counsel to pursue on direct appeal when they spoke.  The Petitioner stated that Counsel only raised three of these issues.  The Petitioner recounted that he wrote Counsel a letter after he "had gone through the appeal to the Court of Appeals" asking him to raise several additional issues including: (1) whether evidence presented was sufficient to support a conviction; (2) whether it was possible to be convicted of first degree murder while one of the co-defendants was convicted of criminally negligent homicide; (3) whether he could be convicted of first degree murder if the victim died because he was "unplugged" in the Intensive Care Unit; (4) whether charges could be brought against a witness, Massengill for

false statements while testifying; (5) whether the witnesses were allowed to talk with each other and to the prosecutor after the proceedings started but before the witnesses testified; (6) what could be done about inconsistent statements made by other witnesses who testified; (7) whether the use of inmates for the photo line-up violated his rights; and (8) whether money and property missing from evidence affected the Petitioner's credibility at trial or prevented Counsel from effectively cross-examining witnesses at trial. The Petitioner explained that, while he wrote the letter to Counsel after he 'had gone through the appeal to the Court of Appeals,' he had expressed to Counsel his desire to raise these issues on appeal prior to Counsel filing the notice of appeal.

The Petitioner testified that, after he was convicted, he mostly communicated with Counsel through letters because he 'couldn't really get on the phone too much because it was maximum security lock-down.' The Petitioner stated that he did not have an opportunity to discuss his appeal with Counsel in person before Counsel filed the appellate brief.

The Petitioner testified that he asked Counsel to file a motion for a change of venue and the trial court denied the motion, but that Counsel did not raise this issue on appeal. The Petitioner testified that, in his petition for post-conviction relief, he raised the issue that the make-up of the jury violated his equal protection rights because there was not a representative mix of white people and black people on the jury. The Petitioner explained that he wanted a 'half and half jury' made up equally of black people and white people, however, when the post-conviction court asked if he remembered how many black people were on the jury, the Petitioner stated, 'I think ...it probably was just one or two.' The Petitioner acknowledged that the issue of the jury's make-up was not raised on appeal, nor was it addressed in his letter to Counsel, but stated that either Counsel or Scott Kanavos, the Petitioner's attorney before Counsel, had filed a motion regarding the make-up of the jury. On cross-examination, the Petitioner explained that, while he testified that there may have been one or two black jurors in the jury panel, he was not sure if there were any at all. When asked if he remembered the State striking any potential jurors who were black during voir dire, the Petitioner stated that he could not remember that happening.

The Petitioner testified that he did not believe he received effective assistance of counsel. He explained that after the conviction, he spoke with Counsel only one time and that the conversation only lasted five minutes. The Petitioner stated that after the notice of appeal was filed his only interactions with Counsel were through written correspondence. The Petitioner explained that he made it clear to Counsel that he wanted the sufficiency of the convicting evidence issue raised on appeal.

The Petitioner testified that Counsel did raise the issue of the sufficiency of the convicting evidence in the motion for new trial, but that the motion was denied. The State then read the following portion of this Court's opinion on direct appeal which addressed the sufficiency of the convicting evidence: During the trial, the State made out a strong case against Defendant, presenting substantial proof from which the jury could determine that Defendant was guilty of the offenses charged beyond a reasonable doubt. Defendant claimed that he was not directly involved in the robbery or the shooting, yet three eyewitnesses testified that he was present with a gun and that he actively participated in the robbery. One of the eyewitnesses actually observed Defendant shoot the victim who subsequently died. Defendant claimed that these eyewitnesses either committed perjury or mistakenly confused him with someone else, yet presented no reason for their collective bias or proof that anyone other than Malone, Sanford, and Defendant were present....Viewing the record as a whole, we cannot find the State's improper reference to Defendant's pretrial silence made in one brief exchange during a two-day trial had a prejudicial effect upon the jury's verdict, given the overwhelming evidence tending to establish Defendant's guilt.

... The State then presented the Petitioner with a copy of the jury instructions provided to the jury at the Petitioner's trial, but the Petitioner stated that he never saw the document before and was unable to confirm or refute that the document was the jury instructions. The Petitioner reiterated that he could not recall the judge instructing the jury, rather, he 'just remember[ed] hearing the guilty verdict being read.'

The Petitioner admitted that, while he had asked the post-conviction court to set aside his conviction because the trial court denied his motion for a change of venue, he did not know anyone on the jury panel, he was not from the Cleveland area, and, to his knowledge, no one on the jury panel or in the jury pool from which the jury was chosen knew who he was prior to the trial. The Petitioner stated that during the voir dire process the potential jurors were asked if they knew anything about the case from having heard about it in the media, and he did not remember anyone stating that they new about the case.

The State called Denise Barnes, the court reporter from the Petitioner's trial. Barnes testified that she prepared the jury charge for the trial court, and she recognized the verdict report forms from the Petitioner's case. Barnes explained that, while she could not specifically remember Judge Ross instructing the jury in the Petitioner's case, she has never been in a trial with the judge when he did not instruct the jury from the charge she prepared. When asked what she would do if the judge sent the jury out for a verdict without reading a jury charge, Barnes stated that she would tell him that he forgot to charge the jury. Barnes testified that this did not happen in the

Petitioner's case and something like forgetting to charge the jury would leave an impression.

Counsel testified that he has practiced as an attorney since September of 1977 and had been an assistant district attorney for approximately nine years at the time he started his private practice. Counsel stated that, as an assistant district attorney, he prosecuted "substantially more than 10" homicide cases. Counsel explained that, since he left the district attorney's office, criminal law has remained a component of his private practice, including some homicide cases.

Counsel testified that he was court-appointed after the Petitioner "got disgruntled" with Kanavos, his former attorney. Counsel explained that after he was appointed, he interviewed witnesses and talked with police officers and the Petitioner to try to determine exactly what the facts of the case were. Counsel stated that, while he had not reviewed his file pertaining to the Petitioner's case prior to the post-conviction hearing, he remembered that he "expended a good deal of effort" in defending the Petitioner. Counsel testified that he filed at least one motion to dismiss the charges against the Petitioner for technical defects. Counsel recalled that this was one of the "substantial issues" raised on appeal.

Counsel was asked to identify the judge's jury charge and testified that the charge contained lesser-included offenses charged for each offense. Further, Counsel testified that the judge charged the jury with lesser-included offenses. Counsel recalled preparing for the appeal:

I was sitting in ... my home on Saturday evening, trying to prepare this to submit to the Court of Appeals, and reading extensively over the transcript of the trial, I consciously evaluated the issue of ... the sufficiency of the evidence. I had ... discussed with [the Petitioner] the fact that this was really going to be a swearing contest. There's no question that people got shot and a person was killed. [The Petitioner], in discussing the case with me, indicated he didn't know anything about what was going on .... in terms of trying to say what we were going to argue in terms of sufficiency of the evidence, it really broke down to whether or not the jury believed those individuals who testified or believed him. Now, the witnesses themselves, the victims themselves had some inconsistencies, as I recall.... One said, I think [the Petitioner] pulled the trigger and the other one said he didn't, or something along those lines. But when I'm sitting there trying to come up with a reason to argue to the Court of Appeals with any sense of propriety, in reading that transcript over and over and over again, I couldn't say that a reasonable jury listening to that evidence could not pull out some proposition that [the Petitioner] was involved in this robbery and did participate, either as an accomplice or as a principle in the shooting that occurred.

Counsel further explained that, although there were inconsistencies in the witnesses'

testimony, all of the witnesses clearly stated that the Petitioner was involved in the crime. He testified, "I just couldn't come up with something that I could write with any reason to say that, that a jury couldn't have gleaned something out of the evidence. And really, the credibility of [the Petitioner] was [ ] most important...."

Counsel testified that he felt the strongest argument on appeal was that the Petitioner's right to remain silent was denied. Counsel explained that the State asked Detective Bennett during cross-examination whether the Petitioner had cooperated with the police, and that Detective Bennett said that the Petitioner had been unwilling to give a statement or cooperate with police. Counsel stated that he felt this was the strongest argument on appeal because it "implicated [the Petitioner's] credibility, and may have provided some basis for the jury to assign less credibility to him than the others, simply because he didn't give his story to them at that time."

Counsel explained that he "wanted to focus on the issue of credibility as opposed to try to analyze the nuances of what each witness said and how it may have contradicted the other ...," because he was concerned that arguing the sufficiency of the convicting evidence claim would deflect from the credibility argument. He stated that:

I would much rather them focus like a laser beam on what I felt like was the critical thing that would provide [the Petitioner] a new trial, as opposed to [ ] writing 50 pages of this witness said this and this contradicts this witness who said that ... when I know full well that the only thing [the Court of Criminal Appeals has] to say is the jury believed this person and disbelieved everybody else and that's sufficient to convict.... Now would that have adversely affected [the credibility argument]? It may, it may not have, but that was my strategy.

On cross-examination, Counsel reiterated that there were inconsistencies in the statements given by witnesses at the trial, but explained that he felt the crucial damage to the Petitioner's case was the testimony provided by Detective Bennett stating that the Petitioner was uncooperative. Counsel testified that, if the Petitioner's credibility was damaged by Detective Bennett's testimony, he did not see how the Court of Criminal Appeals could find the error to be harmless because of the damage to the Petitioner's defense.

Counsel recalled that, prior to the trial, he and the Petitioner spoke extensively about trial preparation and trial strategy, including who to call as witnesses. Counsel explained that he raised several issues at the Petitioner's request including the character of the jury, but that he "didn't really see a whole lot of substance to that issue." Counsel was shown a document in which the Petitioner requested an interlocutory appeal from the denial of the motion for a change of venue, and he explained that the reason he did not file the appeal was that the trial court told them that the case was going to be tried and he felt the issue was "not substantial."

Counsel testified that, while he spoke with the Petitioner regarding his appeal, he did not specifically remember discussing whether or not to raise the sufficiency of the convicting evidence issue on appeal. He explained, "I would not contradict anything [the Petitioner] said about us having conversations about that. I feel confident though ... that if and when we did have those conversations, I would have explained to him my thought processes about why that wasn't raised." Counsel reiterated that he wanted the appellate court to focus on the issue of Detective Bennett's statements attacking the Petitioner's credibility. Counsel stated that, while the appeal was not successful, it was a deliberate strategy to focus on the issue of credibility rather than to raise the issue of witnesses' testimony that was inconsistent as to minor issues.

The post-conviction court reviewed the verdict forms and stated that the jury found the Petitioner guilty of first degree murder in the perpetration of aggravated robbery. Counsel agreed and stated that "that was another ... strong issue on dealing with this consideration of raising sufficiency of the evidence, because all [the jury] had to do was find that he ... participated in it, whether he pulled the trigger or not...."

*Reid v. State*, 2004 WL 626714, at *7 -9 (Tenn.Crim.App. 2004).

## IV.  ANALYSIS

Petitioner's claims are confusingly pled and difficult to decipher.  Because any claim that was not raised in the state courts is procedurally defaulted, the Court will only address those matters which were fully exhausted in state court.  It appears that petitioner alleges sixteen instances of ineffective assistance of counsel, two of which are properly before the Court, as they are the only claims petitioner raised in state court, thus, giving the state courts a full and fair opportunity to resolve the federal constitutional claims before those claims were presented to this federal habeas court.  Petitioner also raises a due process and insufficient evidence claim which are barred by procedural default.  The Court will address these two instances of ineffective assistance of counsel that are not procedurally barred and then proceed to analyze the sixteen procedurally defaulted claims.

## A.    Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel rendered ineffective assistance in sixteen instances in violation of his constitutional right to effective assistance of counsel.  However, petitioner has procedurally defaulted fourteen of those claims.  The Court will address the alleged instances of ineffective assistance of counsel after identifying the law which applies to ineffective assistance of counsel claims.

Federal courts must defer to state court factual findings, according them a presumption of correctness that the petitioner may rebut only with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  This presumption only applies to underlying basic, primary, or historical facts, and not to mixed questions of facts and law.  *Rickman v. Bell,* 131 F.3d 1150, 1153 (6th Cir. 1997), *cert. denied,* 523 U.S. 1133 (1998);*West v. Seabold,* 73 F.3d 81, 84 (6th Cir.), *cert. denied,* 518 U.S. 1027 (1996).  Ineffective assistance of counsel in a petition for habeas corpus review presents a mixed question of law and fact.   *West v. Seabold,* 73 F.3d at 84.  Therefore, a state court's conclusion counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254 (e)(1).  State court findings of fact made in the course of deciding an ineffectiveness claim are subject to the deference requirement of 28 U.S.C. § 2254(e).  However, the performance and prejudice components of the ineffectiveness inquiry, which are mixed questions of law and fact, are not entitled to the deference.  *See Rickman,* 131 F.3d at 1153-54.

To obtain relief, Petitioner must show the state court's adjudication resulted in a decision that involved an unreasonable application of clearly established Federal law as determined by the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *see also, Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164 (2004) (Stating that a claim of ineffective assistance of counsel

presents a mixed question of fact and law, thus, requiring the application of the "unreasonable application" prong of § 2254(d)(1), the United States Court of Appeals for the Sixth Circuit observed that "a federal court may not grant a writ of habeas corpus 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.   Rather that application must also be unreasonable.'" (*quoting Williams v. Taylor*, 529 U.S. 362, 411 (2000)).

The Supreme Court in *Strickland v. Washington,* 466 U.S. 668 (1984), established the criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious.  To establish his attorney was not performing within the range of competence demanded of attorneys in criminal cases, a defendant must demonstrate the attorney's representation fell below an objective standard of reasonableness.  *Strickland,* 466 U.S. at 687-88; *McMann v. Richardson,* 397 U.S. 759, 771 (1970).  The *Strickland* test requires that a defendant demonstrate two essential elements:  (1) counsel's performance was deficient, *i.e.,* counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, *i.e.,* deprived the defendant of a fair trial rendering the outcome of the trial unreliable.  *Id.* at 687-88; *McQueen v. Scroggy,* 99 F.3d at 1310-11; *Sims v. Livesay,* 970 F.2d 1575, 1579-81 (6th Cir. 1992).  S*ee also Flippins v. United States,* 808 F.2d 16, 17-18 (6th Cir.), *cert. denied,* 481 U.S. 1056 (1987).  As the Sixth Circuit explained in *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied,* 508 U.S. 975 (1993): "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won."  *See also West v. Seabold,* 73 F.3d at 84.  "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding

if the error had no effect on the [ultimate] judgment." *West,* 73 F.3d at 84, *quoting Strickland,* 466 at 691, *citing Smith v. Jago,* 888 F.2d at 404-05. There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689; *Sims,* 970 F.2d at 1579-80.

"Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell,* 126 F.3d 843, 847 (6th Cir. 1997), *cert. denied,* 523 U.S. 1079 (1998), *citing, Strickland,* 477 U.S. at 687; *United States v. Cronic,* 466 U.S. 648, 658, (1984); *McQueen v. Scroggy,* 99 F.3d at 1310-1311. The Court cannot indulge in hindsight, but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland,* 466 U.S. at 690; *McQueen,* 99 F.3d at 1311. Trial counsel's tactical decisions are particularly difficult to attack. *McQueen,* 99 F.3d at 1311; *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir. 1994). A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *McQueen,* 99 F.3d at 1311; *O'Hara,* 24 F.3d at 828. Effective assistance of counsel is presumed, and the Court will not generally question matters involving trial strategy. *See United States v. Chambers,* 944 F.2d 1253, 1272 (6th Cir. 1991), *cert. denied,* 502 U.S. 1112 (1992).

To establish the prejudice prong, petitioner must show that absent his attorney's errors, there is a reasonable probability that the result of his trial would have been different. *Lynott v. Story,* 929 F.2d 228, 232 (6th Cir. 1991). "[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998), *quoting Strickland v. Washington,* 466 U.S. at 690. The Court must make an independent judicial evaluation

of counsel's performance, and determine whether counsel acted reasonably under all the circumstances. *McQueen,* 99 F.3d at 1311; *O'Hara,* 24 F.3d at 828; *Ward v. United States,* 995 F.2d 1317, 1321-22 (6th Cir. 1993); *Sims,* 970 F.2d at 1580-81.

Turning to the ineffective assistance claims presented in the instant habeas petition, the Court will first address the two claims of ineffective assistance of counsel that are not procedurally barred. Thereafter, the Court will explain why the remainder of the alleged instances of ineffective assistance of counsel and the denial of due process and insufficient evidence claims are procedurally barred.

### 1. Counsel's Failure to Raise an Insufficient Evidence Claim

Petitioner claims trial counsel was ineffective for failing to challenge the sufficiency of the convicting evidence. Apparently, petitioner contends counsel should have attacked the sufficiency of the evidence and argued that petitioner's truthful testimony outweighed the untruthful testimony of the State's witnesses (Court File No. 2).

Counsel explained that he evaluated the sufficiency of the evidence issue and, based on the evidence presented, could not make a credible sufficiency of the evidence argument because, although there were some minor inconsistencies in the statements of the victims, there was sufficient evidence for the jury to believe the person or persons who identified petitioner as the shooter. The post-conviction court found petitioner was not denied effective assistance of counsel for counsel's failure to raise sufficiency of the evidence as explained below:

> Petitioner was represented at the original trial in this case by [Counsel]. Trial counsel testified at the hearing on Post conviction Relief that he had expended a great deal of time in preparation for this trial. Counsel vigorously argued pretrial motions in this case, and, after conviction at trial, argued the issues he felt to be relevant on appeal.

Petitioner made allegations that he wanted trial counsel to raise the issue of 'sufficiency of evidence' at the appeal in this matter, and that it was not done. Counsel testified that his decision not to raise the 'sufficiency of evidence' issue on appeal was a conscious decision on his part. Trial counsel stated that he thought his better chances on appeal consisted of those issues with some merit, especially the issue concerning one of the state's officer witnesses at trial testifying that the [Petitioner] 'did not cooperate with' him when he tried to get a statement from him upon his apprehension after the Interstate chase.

While the issue of 'sufficiency of evidence' was not specifically dealt with at the appellate level, the court there made rather significant comments on the evidence when they held that any reference to the Petitioner's refusal to give a statement was harmless error.

[Addendum No. 2, at 52-53].

[A] federal habeas court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record– that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson v. Virginia*, 443 U.S. at 326. Applying this criteria to the facts of petitioner's case, a rational trier of fact could reasonably have found that the petitioner committed first degree felony murder, especially aggravated robbery, aggravated robbery, attempted aggravated robbery, and evading arrest.

The evidence in this case reveals that law enforcement pursued the shooting suspects and defendant was the driver of the vehicle being pursued by law enforcement. Petitioner and one of his co-defendant's ran from law enforcement but both were eventually captured, one in the woods and one at a nearby truck-stop. The police discovered two boxes of .22 rimfire ammunition, a black stocking-type mask, a cap, and articles of clothing in the vehicle. At the crime-scene the police found five .22 shell casings. The police discovered the three guns involved in the crime: a .22 caliber revolver pistol, a Phoenix .22 caliber semi-automatic pistol, and a Haskell .45 caliber semi-

automatic pistol. The Tennessee Bureau of Investigation crime lab matched the five casings recovered from the crime scene to the Phoenix .22 semi-automatic handgun. *Reid v. State*, 2004 WL 626714, at *2. And, the three eyewitnesses–the victims in this case–testified that petitioner was present with a gun and actively participating in the robbery. One of the victims actually observed petitioner shoot the victim who subsequently died.

The post-conviction appellate court concluded counsel was not ineffective for failing to raise a sufficiency-of-the-evidence claim on direct appeal. Counsel explained that he decided the sufficiency of the evidence was not a viable claim because after evaluating the witnesses' inconsistencies, he concluded that all the witnesses clearly stated petitioner was involved in the crime. Counsel made a strategic decision to focus on what he identified as the most important and strongest argument on appeal *i.e.*, the State's improper attack on the petitioner's credibility when the state made reference to petitioner's pre-trial silence. Counsel considered potential issues to raise on appeal and concluded the issue of the sufficiency of the evidence lacked merit and may have had an adverse effect on the credibility argument. The appellate court concluded counsel's performance was within the wide range of reasonable assistance. The record supports the appellate court's findings.

The Court observes that the evidence against petitioner was overwhelming and given the facts of the case, it was not unreasonable for appellate counsel to conclude the sufficiency of the evidence argument lacked merit. Therefore, the state court decisions rejecting petitioner's claim that counsel rendered ineffective assistance when he failed to raise sufficiency of the evidence on direct appeal was objectively reasonable. Similarly, the state court decisions were based on a reasonable determination of the facts in light of the evidence presented. Consequently, petitioner

is not entitled to habeas relief on his claim of ineffective assistance of appellate counsel for failing to attack the sufficiency of the evidence on direct appeal.

The appellate court also concluded that even if they were to find that counsel erred by failing to raise the issue of the sufficiency of the evidence on appeal, petitioner presented no evidence of prejudice, thus he was not entitled to relief on this claim. The record before this Court supports the appellate court finding as the evidence is sufficient to support his convictions. If the evidence is sufficient to support the conviction, then petitioner is unable to demonstrate any resulting prejudice as a result of counsel's failure to appeal the sufficiency of the evidence.

To demonstrate prejudice, petitioner must demonstrate the alleged error by counsel had an effect on the judgment because a deficiency in counsel's performance, standing alone, does not amount to ineffective assistance of counsel if no actual prejudice is demonstrated. *Strickland*, 466 U.S. at 687-90. In order to meet his burden of proof, petitioner must satisfy a high, threshold showing of actual prejudice. Actual prejudice is when a reasonable probability exists "that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id*. at 694. Such a situation is not presented in petitioner's case.

When evaluating the sufficiency of the evidence, the Court applies the standards clearly set out in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In accordance with *Jackson* a state shall not obtain a conviction without proving each and every element of an offense beyond a reasonable doubt. On collateral review, the *habeas* court must construe all findings of fact in the light most favorable to the prosecution. *Jackson v. Virginia*, 443 U.S. at 319. Petitioner must show that the state court decision on this issue was the result of an unreasonable determination of the facts in light

23

of the evidence presented in state court. See 28 U.S.C. § 2254(d)(2).

Sufficient evidence supports a conviction if, after viewing the evidence and the inferences to be drawn therefrom in light most favorable to the prosecution, the Court can conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 324; *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir.), *cert. denied*, 516 U.S. 975 (1995). This standard of review does not permit the federal habeas court to make its own subjective determination of guilt or innocence; the standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). This due process guarantee of sufficiency of the evidence extends only to facts needed to establish the elements of the crime.

Pursuant to 28 U.S.C. § 2254(e)(1), a determination of a factual issue made by a state court shall be presumed correct, and the burden is on petitioner to rebut the presumption of correctness with clear and convincing evidence. Where the state court findings have support in the record, those findings must control, even though the federal habeas court may be inclined to render other findings which also have support in the record. See 28 U.S.C. § 2254(d)(2); *Wainwright v. Goode*, 464 U.S. 78, 85 (1983).

In a federal habeas corpus proceeding in which a state prisoner challenges the sufficiency of the evidence supporting his conviction, the prisoner "is entitled to a determination whether the record evidence could support a finding of guilt beyond a reasonable doubt." *Moore v. Duckworth*, 443 U.S. 713, 714 (1979). However, the petitioner is entitled to habeas relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 324 (1979). *See Brofford v. Marshall*, 751

F.2d 845, 856 (6th Cir.), *cert. denied*, 474 U.S. 872 (1985).

Witness credibility is an issue to be left solely within the province of the jury, *United States v. Schultz,* 855 F.2d 1217, 1221 (6th Cir. 1988), and substantial deference should be given to the trier of fact. *United States v. Ayotte*, 741 F.2d 865, 867 (6th Cir.), *cert. denied*, 469 U.S. 1076 (1984). In addition, credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy,* 99 F.3d at 1310, *Smith v. Jago,* 888 F.2d at 407. The Sixth Circuit has previously found that the appellant "bears a heavy burden" when insufficiency of the evidence is claimed. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.), *cert. denied*, 476 U.S. 1123 (1986). "It is for the jury, not this court, to assess the credibility of the witnesses presented at trial." *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992). This Court should not attempt to substitute its opinion for that of the jury which convicted petitioner. *York v. Tate*, 858 F.2d 322, 329 (6th Cir.), *cert. denied*, 490 U.S. 1049 (1989).

The trial court found that the evidence in this case was sufficient to support a finding of guilt beyond a reasonable doubt. The appellate court concluded that even if counsel erred by failing to raise a sufficiency-of the-evidence claim, petitioner presented no evidence of prejudice or that the outcome would have been different. The appellate court observed that it had addressed the sufficiency of the conviction evidence issue on direct appeal when it commented that the State's case against petitioner was strong as it presented "'substantial proof from which the jury could determine that [Petitioner] was guilty of the offenses charged beyond a reasonable doubt.'" *Reid v. State*, 2004 WL 626714, *13 (Tenn.Crim.App. 2004), *perm. app. denied,* (Sept. 13, 2004), *quoting State v. Reid*, 2001 WL 818205, at *11 (Tenn.Crim.App. 2001), *perm. app. denied*, (Dec. 27, 2001).

Petitioner alleges the state court decision is contrary to, or involves an unreasonable

application of clearly established federal law as determined by the Supreme Court of the United States, and the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner contends that he was convicted without the state proving each and every element of the offense. A review of the testimony of the eyewitnesses reveals petitioner's contention lacks merit.

Eric Benion, one of the victims, testified petitioner and each of his two co-defendants had a weapon and that one of petitioner's co-defendants took $28.00 from him. Soon thereafter, shooting began and Benion jumped up, ran back into the apartment, and jumped through the second story window, getting shot in the hand during his escape. Benion ran to another apartment building and asked a friend to call the police. Benion described the shooters' car, gave a statement to law enforcement, and eventually identified petitioner from a lineup at the police department later than evening.

Marcus Williams, another victim, testified that petitioner and his two co-defendants, who were each armed, ordered Williams and his friends down on the ground at gun-point. Petitioner and one of his co-defendants searched the victims' pockets for money. When the shooting began Williams and Benion immediately jumped up and ran into the apartment; Williams locked the door, and stayed in the apartment until the ambulance arrived. Williams identified petitioner as one of the men who took part in the robbery.

Charles Massengill, another victim, testified petitioner, Sanford, and Malone robbed them. Petitioner and Sanford had guns. Sanford made him sit in a chair and pointed a gun at this right eye; Malone ordered Benion, Williams, and Blair outside onto the balcony; and subsequently made them lie face-down. Petitioner pointed his gun at Blair while the three men searched the victims'

pockets for money. They took 79 cents from Massengill. Thereafter Blair mumbled something, petitioner responded, and then shot Blair. Immediately thereafter, Sanford shot Massengill in the right eye and he lost consciousness.

Having considered the evidence in the light most favorable to the prosecution, as instructed by *Jackson*, there is absolutely no doubt that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Consequently, the state court's adjudication of this claim and its resulting decision that counsel was not ineffective for failing to raise an insufficient evidence claim, was not "contrary to" or an unreasonable application of clearly established Supreme Court precedent. Similarly, it did not involve an unreasonable determination of the facts. The evidence was sufficient to allow a rational trier of fact to find petitioner guilty of murder, especially aggravated robbery, aggravated robbery, and evading arrest beyond a reasonable doubt; thus, he has not demonstrated he suffered any prejudice as a result of counsel's decision to forego the sufficiency-of-the-evidence claim on direct appeal. Accordingly, no relief can be granted on this ineffective assistance of counsel claim which will be **DISMISSED**. Respondent will be **GRANTED** summary judgment on the sufficiency of the evidence claim.

### 2.     *Per Se* Ineffective Assistance of Counsel

Although petitioner's claims are confusingly pled, the Court presumes he raises the same claims he raised in state court which included a claim that it is *per se* ineffective assistance of counsel if the issue of sufficiency of the evidence is not presented on direct appeal. In this claim, petitioner requests the Court to depart from existing case law and rule that the failure to raise the issue of sufficiency of the evidence in the appellate court on direct appeal is *per se* ineffective

assistance of counsel. Petitioner does not support this claim with any case law.

The state court declined petitioner's invitation to hold in all criminal appeals as of right, that if the issue of sufficiency of the evidence is not presented to the appellate court it is *per se* ineffective assistance of counsel. This Court also declines the invitation. Moreover, the state court's ruling that failure to raise the sufficiency of he evidence on direct appeal is not *per se* ineffective assistance of counsel is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

Under the AEDPA, it is petitioner's burden to demonstrate the state court decision resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States or that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Thus, to demonstrate a state court decision is contrary to federal law under the AEDPA standard, petitioner must demonstrate "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or...the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). To demonstrate the decision was an unreasonable application of federal law, a habeas petitioner must show the state court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] the principle to the facts of the prisoner's case." *Id.* Petitioner has not presented any argument or evidence that the Tennessee appellate court decision resulted in a decision that was contrary to or an unreasonable application of Supreme Court precedent, or that the state court decision was a result of an unreasonable determination of the facts presented before it.

Thus, the Court concludes the Tennessee Court of Appeal's opinion, that in all criminal appeals as of right counsel's failure to raise the issue of sufficiency of the evidence is not *pre se* ineffective assistance of counsel, was neither contrary to nor unreasonable application of clearly established federal law as interpreted by the Supreme Court. In addition, the state court decision was not based on an unreasonable determination of the facts before it. Accordingly, respondents motion for summary judgment on this claim is **GRANTED**.

### 3.    Procedural Default

Petitioner's remaining fourteen claims of ineffective assistance of counsel and two claims attacking his convictions are procedurally defaulted as petitioner failed to raise these claims on direct appeal or on appeal of the denial of his post-conviction petition.[2]  Petitioner filed a § 2254 form-petition, raising four claims (Court File No. 2), and a typewritten petition for writ of habeas corpus

(Court File No. 2-2), which actually appears to be a supporting memorandum, raising sixteen claims.[3]

---

[2]      Petitioner raised the following two claims on direct appeal of the denial of his state post-conviction petition:

1.      Whether the trial court erred in finding that there was no merit to appellant's claim that trial counsel was ineffective by not raising the issue of sufficiency of the evidence on appeal and dismissing the petition for post conviction relief.

2.      Whether the failure of counsel to raise the issue of sufficiency of evidence in the appeal as a matter of right from the trial court is per se ineffective assistance of counsel.

(Addendum No. 7).

[3]      Although petitioner added claims to the amended petition, he failed to include three of the claims from his original § 2254 petition.  Therefore, the Court will address all claims in both

Petitioner's § 2254 form-petition contained four grounds for relief. Three of the claims, (1)–counsel denied petitioner right to have witnesses testify; (2)–denial of due process because robbery conviction was based on insufficient evidence; and (4)–conviction based on false statements, are all procedurally defaulted. The only claim that is not procedurally defaulted, ground (3)–counsel's failure to appeal the sufficiency of the evidence, is properly before the Court and has previously been adjudicated above in Section IV.A.1. Likewise, questions one and two in petitioner's typewritten petition (Court File No. 2-2), were adjudicated previously in this memorandum opinion (Section IV.A. 1 & 2). In addition, as identified in petitioner's typewritten petition for writ of habeas corpus (Court File No. 2-2), question three through sixteen, which consists of fourteen alleged incidences of ineffective assistance of counsel, are procedurally defaulted because none of these claims was properly presented to the state appellate court.

Petitioner's procedural default of the remaining claims of ineffective assistance of counsel prevents the Court's consideration of their merits. The procedural default barrier, in the context of habeas corpus, precludes federal courts from reviewing petitioner's remaining habeas claims because they are not exhausted in state court and can not be raised in state court now; thus, they are procedurally defaulted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).

In the instant case, petitioner's allegations of ineffective assistance of counsel contained in questions three through sixteen of his typewritten petition for writ of habeas corpus (Court File No. 2-2) were never presented to the state courts. Since petitioner never alleged habeas questions three through sixteen as federal claims in state court on appeal, and he does not attempt to excuse his procedural default by demonstrating cause for the default and actual prejudice as a result of the

petitions.

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice, such claims are barred from habeas review. *See Coleman v. Thompson*, 501 U.S. 722 (1991).

Likewise, petitioner's ineffective assistance claim based on counsel's failure to call defense witnesses, his due process claim that the evidence was insufficient to support the robbery convictions, and his claim that the convictions were based on false statements, were never presented to the state courts. On direct appeal, petitioner did not raise these claims. Rather, on direct appeal he claimed the state failed to comply with the mandatory procedures concerning proper presentation and filing of the indictment in his case as required by statute, and the trial court erred by refusing his request for a mistrial after the State improperly solicited testimony concerning the his right to remain silent upon arrest. *State v. Reid*, 2001 WL 818250 (Tenn.Crim.App. 2001). Consequently, grounds one, two, and four contained in petitioner's habeas petition (Court File No. 2) were never properly presented to the state appellate court.

Absent a showing of cause and prejudice or actual innocence, these claims, being procedurally defaulted for purposes of federal habeas review, are barred from federal habeas review. Respondent's motion for summary judgment on these claims will be **GRANTED**.


IV.    **CONCLUSION**

Having thoroughly considered both parties' pleadings together with the state court record, the Court concludes petitioner has not put forth a valid claim for ineffective assistance of appellate counsel or any other claim he has raised. Additionally, petitioner put forth no valid cause and prejudice or actual innocence proof to excuse his procedural default of those claims which he failed

to properly raise in state court.  In conclusion, there is no basis on which to grant the writ of habeas corpus; thus, respondent's motion for summary judgment will be **GRANTED** on all claims.

An appropriate judgment will enter.

**/s/**_____
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**